OPINION
Defendant-appellant Michael B. Farrington appeals his convictions and sentences entered by the Delaware County Court of Common Pleas on one count of attempted murder, in violation of R.C. 2923.02; and one count of domestic violence, in violation of R.C. 2919.25, following a jury trial. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE
On February 2, 1999, the Delaware County Grand Jury indicted appellant on one count of attempted murder, one count of felonious assault, and one count of domestic violence. At his arraignment on February 12, 1999, appellant entered pleas of not guilty to the charges contained in the indictment. Appellant, through counsel, filed a Motion for Competency Evaluation pursuant to R.C. 2945.37.1. Via Entry filed on March 22, 1999, the trial court ordered NetCare Forensic Psychiatry Center in Columbus, Ohio, to evaluate appellant's competency. The trial court conducted an oral hearing on the competency evaluation on May 7, 1999. Based upon the clinical psychologist's report, the trial court found appellant competent to stand trial. A jury trial commenced on August 24, 1999. At trial, Jason Passet, a deputy sheriff with the Delaware County Sheriff's Department, testified he was on general patrol during the early morning hours of January 23, 1999, when he responded to a 911 hangup call at 1053 Blackberry Lane, Lewis Center, Delaware County, Ohio. Upon his arrival at the address, the deputy knocked on the door and announced himself, however, he neither received a response nor heard anything inside. Deputy Passet knocked and announced himself three additional times without response. Deputy Spring arrived at the scene as back-up. As Deputy Passet stepped off the porch to talk to his colleague, he heard a voice call for help. After hearing a second call for help, the deputies kicked in the door and entered the apartment. They immediately found no one inside and the residence in darkness. However, the deputies heard a third cry for help coming from the upstairs. They ascended the stairway and discovered a male and female on the floor of the master bedroom. The male, who was ultimately identified as appellant, was on top of the female, holding her down with his hands and knee. The female, later identified as Jennifer Davis, appellant's former girlfriend, was lying in a fetal position on the floor. The deputies found Davis naked from the waist up, her chest, breast, and face covered in blood. Her nose was bleeding and her hair was matted. Deputy Passet ordered appellant off of Davis, to which appellant complied. Passet instructed appellant to lay on the bed, prone on his stomach. After handcuffing appellant, Deputy Passet conducted a pat down search for weapons as well as a search for some form of identification. The deputy found neither a weapon nor identification. Throughout the encounter, appellant repeatedly yelled he was St. Michael, the Arc Angel, and Davis was a demon who needed to be killed. Appellant flailed back and forth on the bed. In order to avoid striking his head on the headboard, Deputy Passet released appellant, who immediately stood up and charged toward the deputies. Deputy Spring sprayed appellant with pepper spray. Thereafter, appellant attempted to leap out a bedroom window. Appellant's second attempt at escape also failed. Deputy Passet continued to try to gain control of appellant. A third deputy, Brian Brown, arrived at the scene and was able to subdue appellant. Appellant was transported to Riverside Hospital. Deputy Spring, who accompanied appellant to the hospital, did not observe any injuries on appellant's person. Deputy Passet remained at the scene with appellant's and Davis' two small children. After Children's Services arrived and removed the children, Passet photographed the entire apartment. Passet was informed a knife could have possibly been involved in the attack, however, a forty-five minute search for the weapon was unfruitful. Deputy Brian Brown proceeded to St. Ann's Hospital in order to interview Davis. Brown described Davis' appearance, noting the victim's face was swollen and bruised, her eyes were black and blue, and she had sustained two lacerations on her left arm, one of which was very deep, as well as some abrasions. Despite the great amount of swelling around and in her mouth, Davis was able to give Deputy Brown an oral statement of the events which had transpired earlier that morning. Davis also testified at trial. She stated she was asleep during the early morning hours of January 23, 1999, when appellant entered her bedroom. Davis observed appellant crouch down and crawl up next to the bed. Before she realized what was happening, appellant pounced on her and she felt a knife blade across her throat. Davis put up her hand in order to block the knife, which resulted in her hand being cut. At some point during the encounter, appellant cut Davis' shoulder. Davis subsequently felt the knife go across the back of her neck, tugging and pulling her hair. Appellant repeatedly struck Davis in the head and face. Thereafter, appellant, who was wearing steel-toed workboots, threw Davis onto the floor and began to kick her entire body. Appellant then held Davis down. Davis felt as if appellant was trying to rip out her windpipe with his fingernails. Appellant picked up Davis and threw her onto the bed, where he continued to beat and hit her. Suddenly, appellant stopped the attack, moved to the doorway, and looked into the hall. Davis grabbed the telephone and tried to dial 911, however, appellant reappeared and kicked the phone out of Davis' hand. Appellant began to chant, "Anastagah, Sekata", the names of his and Davis' children. Davis described the scene as if appellant was in a trance. Appellant stopped his attack a second time, proceeded to the doorway and looked down the hall. Davis grabbed the telephone and again dialed 911. Appellant returned and resumed the beating — punching, hitting, kicking, and biting Davis. Just as Davis thought she was going to lose consciousness, Deputies Passet and Spring arrived. While the deputies struggled with appellant, Davis dragged herself out of the bedroom into the hallway. When asked why appellant was in her apartment that morning, Davis explained he had come to visit the children. She denied the existence of a romantic relationship between appellant and herself, and noted the two had not been romantically involved for at least one and a half years. Davis acknowledged she had been subjected to domestic violence at appellant's hands on at least two prior occasions. Davis stated, at some point after the attack, she informed the police appellant had brandished a knife. After being discharged from the hospital, Davis stopped at her apartment prior to going to the police station to complete necessary paperwork, and located a knife covered with what appeared to be her hair and her blood. She wrapped the knife in a towel and turned it over to the police. Ryan Bowman, a physician's assistant in the emergency room at St. Ann's Hospital, confirmed the nature of Davis' injuries. Appellant testified on his own behalf. Appellant stated Davis had picked him up on the morning of January 22, 1999, in order for appellant to visit with their children. Appellant stayed with the children all day while Davis was at work. Davis met friends that evening, and appellant babysat for the children. Appellant testified when Davis arrived home at approximately 12:30 a.m. on January 23, 1999, she started an argument with him because their son was awake. Appellant stated Davis' became angrier when she observed a pan of food on the stove. Appellant took his son upstairs and placed the child in his crib. He returned downstairs, and tried to calm Davis, however, she would not "stop freaking out and screaming". Appellant laid down on the couch and pulled a blanket over his head. Thereafter, Davis went upstairs and appellant fell asleep on the couch. Later that morning, Davis returned downstairs and woke up appellant. Appellant testified Davis made sexual advances toward him, and when he rebuffed her she became angry and started to yell. Appellant testified his efforts to calm her only made her angrier and she became verbally and physically abusive toward him. At some point during this encounter, Davis proceeded to the kitchen, retrieved a knife, and came after appellant. Appellant recalled Davis told him she would kill the children because she was unsuccessful in her attempts to kill him. Appellant caught Davis in the upstairs hallway as she was about to enter their son's bedroom. Appellant grabbed her and threw her back down the hallway toward the master bedroom. After an extended struggle, appellant forced Davis into the master bedroom. Appellant further testified he yelled for help and attempted to call 911 during this time. As some point, the deputies arrived. Appellant admitted a struggle ensued between Deputy Passet and him, but he explained such encounter occurred only after Deputy Passet forced appellant onto the bed into a position in which he could not breathe. On cross-examination, appellant admitted he had two domestic violence convictions, one in September, 1998, and the other in October, 1998. Davis was the victim in both instances. When asked how Davis sustained her injuries on January 23, 1999, appellant offered no explanation. After hearing all the evidence and deliberations, the jury found appellant guilty of attempted murder and domestic violence, but not guilty of felonious assault. The trial court deferred sentencing until a presentence investigation could be conducted. At the sentencing hearing conducted on September 27, 1999, the trial court sentenced appellant to a term of imprisonment of five years on the attempted murder count and a term of six months on the domestic violence count. The trial court ordered the sentences be served concurrently. The trial court memorialized the jury's verdicts in a Judgment Entry on Verdict filed August 27, 1999, and the sentence in a Judgment Entry of Sentence filed September 27, 1999. It is from these convictions and sentences appellant prosecutes this appeal, raising the following assignments of error:
 I. THERE WAS INSUFFICIENT EVIDENCE AS A MATTER OF LAW TO SUSTAIN THE APPELLANT'S CONVICTION OF ATTEMPTED MURDER.
 II. THE JURY'S VERDICT OF GUILTY AS TO THE CHARGE OF ATTEMPTED MURDER IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 III. THE TRIAL COURT ERRED TO THE PREJUDICE OF [SIC] BY REQUIRING THE APPELLANT TO STAND TRIAL WHILE SHACKLED.
 IV. THE APPELLANT WAS DENIED A FAIR AND IMPARTIAL TRIAL AS A RESULT OF COMMENTS MADE TO A JUROR DURING THE COURSE OF THE TRIAL, INDICATING THAT THE APPELLANT WAS GUILTY.
 V. THE TRIAL COURT COMMITTED ERROR PREJUDICIAL TO THE APPELLANT WHEN IT REFUSED TO ALLOW THE APPELLANT TO SHAVE OR HAVE AN APPROPRIATE HAIR CUT.
Any other facts relevant to our discussion of appellant's assignments of error shall be contained therein.
 I, II
In his first and second assignments of error, appellant raises sufficiency of the evidence and manifest weight claims. In State v. Jenks (1981), 61 Ohio St.3d 259, the Ohio Supreme Court set forth the standard of review when a claim of insufficiency of the evidence is made. The Ohio Supreme Court held: An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jenks, supra, at paragraph two of the syllabus. Appellant maintains the evidence was insufficient to support a conviction of attempted murder because the State failed to prove the necessary element of purpose. As to "purpose", the trial court instructed the jury as follows:
 A PERSON ACTS PURPOSELY WHEN IT IS HIS SPECIFIC INTENTION TO CAUSE A CERTAIN RESULT. IT MUST BE ESTABLISHED IN THIS CASE THAT AT THE TIME IN QUESTION THERE WAS PRESENT IN THE MIND OF [APPELLANT] A SPECIFIC INTENTION TO PURPOSELY CAUSE THE DEATH OF JENNIFER DAVIS.
 PURPOSE IS A DECISION OF THE MIND TO DO AN ACT WITH A CONSCIOUS OBJECTIVE OF PRODUCING A SPECIFIC RESULT. TO DO AN ACT PURPOSELY IS TO DO IT INTENTIONALLY AND NOT ACCIDENTALLY. PURPOSE AND INTENT MEAN THE SAME THING. THE PURPOSE WITH WHICH A PERSON DOES AN ACT IS KNOWN ONLY TO HIMSELF, UNLESS HE EXPRESSES IT TO OTHERS OR INDICATES IT BY HIS CONDUCT.
 THE PURPOSE WITH WHICH A PERSON DOES AN ACT IS DETERMINED FROM THE MANNER IN WHICH IT IS DONE, THE MEANS OR WEAPON USED AND ALL THE OTHER FACTS AND CIRCUMSTANCES IN EVIDENCE.
Upon review of the entire record and based upon the facts noted supra, we find there was sufficient evidence to establish the element of purpose. Appellant and Davis were the only two adults present during the altercation, and only Davis sustained injuries. During her testimony, Davis recounted how appellant inflicted the injuries upon her. Although appellant asserts the testimony regarding the knife was inconsistent, the evidence detailing Davis' cuts was consistent with the use of a knife. Appellant, on the other hand, was unable to explain how Davis received the cuts, bites, and bruises found on her body. The record reveals appellant repeatedly kicked Davis with steel-toed boots, punched her in the head, bit her, and stepped on her trachea. We find this testimony was sufficient for a reasonable jury to find appellant acted with purpose. On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine "whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment. State v. Thompkins (1997), 78 Ohio St.3d 380,387 citing State v. Martin (1983), 20 Ohio App.3d 172, 175. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, syllabus 1. To support his assertion the jury's verdict on the attempted murder charge was against the manifest weight of the evidence, appellant provides this Court with examples of the inconsistency in the testimony of the witnesses. Upon review of the entire record, we find the jury did not clearly lose its way. The jury was free to accept or reject any or all of the testimony of the witnesses. Davis' testimony alone, if believed by the jury, was sufficient to support the conviction. Furthermore, the testimony of the other witnesses inferentially corroborates Davis' testimony. Accordingly, we do not disagree with the jury's resolution of the testimony. Appellant's first and second assignments of error are overruled.
 III
In his third assignment of error, appellant contends the trial court committed prejudicial error in requiring him to stand trial while shackled. "A criminal defendant is generally entitled to appear in court without shackles, as the presumption of innocence may be undermined when the defendant is presented in restraints." State v. Morgan (1992), 84 Ohio App.3d 229, 231 (Citations omitted). "While shackling is an extreme measure, in some circumstances it is necessary for the safe, reasonable, and orderly progress of the trial." Id. at 232 (Citation omitted). The decision as to whether or not to shackle a defendant lies within the sound discretion of the trial court. The record should reflect the factors upon which the trial court exercised its discretion. Id. Herein, the trial court made the following statement regarding its intention to have appellant remained shackled during the trial:
 THE COURT: ALL RIGHT. WE ARE ON THE RECORD THIS MORNING IN THE CASE OF STATE VERSUS MICHAEL B. FARRINGTON, 99CR-I-02-028. [APPELLANT] IS PRESENT, REPRESENTED BY HIS COUNSEL, CASEY CLARK. AND THE STATE IS REPRESENTED BY LOPA PARIKH AND DUNCAN WHITNEY. THERE IS A MOTION IN LIMINE MADE BY [APPELLANT] THIS MORNING TO PROHIBIT ANY EVIDENCE OR COMMENT ON THE ESCAPE CHARGE. AND SO WE ARE DISCUSSING THAT ISSUE AT THIS POINT, IN TERMS OF HOW TO HANDLE THAT WITH THE JURY IN TERMS OF VOIR DIRE.
 FIRST OF ALL, THE RECORD SHOULD REFLECT THAT [APPELLANT] IS PRESENT AND HE IS IN CIVILIAN CLOTHES. AND HE DOES HAVE HIS FEET SHACKLED THIS MORNING, ALTHOUGH HE HAS NO HANDCUFFS ON. WE DO HAVE TWO DEPUTIES IN THE COURTROOM. ONE TIME OR ANOTHER, WE PROBABLY WILL ONLY HAVE ONE IN THE COURTRO0M. AND THE COURT HAS DECIDED TO LEAVE THE SHACKLES ON [APPELLANT] BECAUSE [APPELLANT] APPARENTLY ESCAPED FROM THE COUNTY JAIL WHILE IN THE CUSTODY OF CORRECTIONS OFFICERS AND WAS ABLE TO RUN ACROSS AN OPEN AREA AND SCALE A FENCE AND LEAVE.
 SO, EVEN WITH TWO DEPUTIES PRESENT, [APPELLANT] I BELIEVE, CERTAINLY COULD DO THE SAME HERE IN THE COURTROOM AS HE DID AT THE COUNTY JAIL. AND THAT'S THE REASON I HAVE ALLOWED THE SHACKLES TO REMAIN ON THIS MORNING. WE DON'T HAVE ANY TECHNOLOGY IN THE COUNTY FOR STUN BELTS. WE REALLY DON'T HAVE ANYTHING THAT WE CAN, IN THE WAY OF SKIRTING TO PUT AROUND THE TABLE. SO, THAT'S WHAT WE ARE LEFT WITH. AND MR. CLARK.
 MR. CASEY CLARK [COUNSEL FOR APPELLANT]: THANK YOU, YOUR HONOR. QUITE OBVIOUSLY, I WOULD LIKE TO MAKE AN OBJECTION TO THE SHACKLES. BUT I THINK THE U.S. SUPREME COURT IN BOTH ESTELLE VERSUS WILLIAMS AND ILLINOIS VERSUS ALLEN HAS INDICATED THAT THE SIGHT OF SHACKLES IS PREJUDICIAL AND DOES CUT INTO THE PRESUMPTION OF INNOCENCE. IN THIS CASE [APPELLANT], BOTH IN THE MUNICIPAL COURT AND IN THIS COURT, HAS NEVER HAD ANY EPISODES OF ANY OF THE ATTEMPTS YOU ARE TALKING ABOUT, NOR HAS HE SHOWN ANY DISRUPTIVE BEHAVIOR THAT WOULD UNDERMINE THIS TRIBUNAL. AS SUCH, WE WOULD OBJECT TO HIS BEING SHACKLED DURING THESE PROCEEDINGS.
 THE COURT: DOES THE STATE HAVE ANYTHING THEY WANT TO PUT IN ON THAT?
MS. PARIKH: WE DON'T OBJECT, YOUR HONOR.
THE COURT: YOU DON'T OBJECT TO WHAT?
 MS. PARIKH: TO [APPELLANT] REMAINING SHACKLED DURING THE COURSE OF THE PROCEEDINGS.
T. at 4-5.
Additionally, the following conversation occurred after appellant decided he would testify on his own behalf:
 MR. CLARK: YOUR HONOR, ONE FINAL THING, IF I MAY CAN WE HAVE HIM ON THE STAND WHEN THEY COME IN BECAUSE OF THE SHACKLES?
 THE COURT: SURE, SURE. WHY DON'T YOU COME AHEAD AND STAND ON THE WITNESS STAND. THEN AFTER HIS TESTIMONY, BECAUSE HE IS THE ONLY WITNESS, WE WILL TAKE ANOTHER RECESS.
MR. CLARK: OKAY.
T. at 246.
Based upon the reason stated by the trial court and the trial court's efforts to ensure the jury did not observe the shackles, we cannot find the trial court abused its discretion in having appellant shackled during the trial. Appellant's third assignment of error is overruled.
 IV
In his fourth assignment of error, appellant maintains he was denied a fair and impartial trial because during the course of the trial, an individual unassociated with the proceedings commented upon appellant's guilt to one of the jurors. Upon returning from the lunchtime recess on the first day of trial, Paul K. Hemmer, one of the jurors, advised the trial court a restaurant worker made a comment to him regarding the case after observing the juror badge. The following conversation occurred between the trial court, counsel for the parties, and Juror Hemmer:
 THE COURT: ALL RIGHT. WE ARE BACK ON THE RECORD IN STATE VERSUS MICHAEL B. FARRINGTON. APPARENTLY, ONE OF THE JURORS HAD AN ENCOUNTER OVER LUNCH THAT WE NEED TO INQUIRE ABOUT. SOMEONE SAID SOMETHING TO HIM ONCE HE REALIZED HE WAS A JUROR. WE HAVE TO HAVE MR. HEMMER COME IN.
PAUL K. HEMMER ENTERS THE COURTROOM.
 THE COURT: ALL RIGHT. MR. HEMMER, IT IS MY UNDERSTANDING YOU HAD THE MISFORTUNE OF GOING TO BURGER KING FOR LUNCH.
MR. HEMMER: I'M AFRAID SO.
 THE COURT: YOU HAD AN ENCOUNTER THERE WITH SOMEONE THAT WAS WORKING THERE?
 MR. HEMMER: I WANTED TO MENTION IT BECAUSE IT WAS SO UNUSUAL FOR SOMEONE — DO YOU WANT TO KNOW WHAT THEY SAID?
 THE COURT: YEAH, JUST TELL ME THE CIRCUMSTANCES OF WHO IT WAS. WAS IT SOMEBODY INSIDE?
MR. HEMMER: IT WAS LIKE A DRIVE-THRU CLERK.
THE COURT: A DRIVE-THRU WINDOW?
 MR. HEMMER: YEAH, AND HE JUST SAID, "YOU ARE ON THAT MICHAEL FARRINGTON CASE," AND MADE A COMMENT ABOUT THE GUILT OF THE DEFENDANT.
THE COURT: WHAT DID HE SAY?
 MR. HEMMER: HE SAID, "WE ALL KNOW HE'S GUILTY." AND SO I WANTED TO BRING IT TO THE COURT'S ATTENTION, JUST BECAUSE IT KIND OF HIT ME FUNNY. OBVIOUSLY, THERE'S MEDIA ATTENTION I'M NOT PICKING UP ON RIGHT NOW. AND SO —
THE COURT: DID YOU SAY ANYTHING IN RETURN?
 MR. HEMMER: ALL I SAID TO HIM WAS, "I CAN'T DISCUSS IT," AND I DROVE AWAY.
 THE COURT: ARE YOU ABLE TO — OBVIOUSLY, THAT PERSON'S NOT A WITNESS AND DOESN'T HAVE ANY INFORMATION ABOUT THIS CASE. ARE YOU ABLE TO PUT ASIDE WHAT THAT PERSON SAID TO YOU AND STILL BE FAIR AND IMPARTIAL IN THIS CASE?
 MS. [SIC] HEMMER: I THINK SO, YES. YOU KNOW, I DON'T KNOW WHAT HE REALLY MEANT WHEN HE SAID THAT, BUT —
 THE COURT: YOU WILL DECIDE THE CASE STRICTLY ON WHAT GOES ON IN THE COURTROOM, WHAT'S PRESENTED HERE IN THE COURTROOM RATHER THAN WHAT YOU MIGHT HAVE HEARD OUTSIDE COURTROOM.
MR. HEMMER: YES.
THE COURT: ANY QUESTIONS BY THE PROSECUTION?
MR. WHITNEY [PROSECUTOR]: NO, YOUR HONOR.
MR. CLARK: NO, YOUR HONOR.
 THE COURT: ALL RIGHT, THANK YOU, SIR. I APPRECIATE YOUR LETTING US KNOW THAT.
MR. HEMMER RETURNS TO THE JURY ROOM.
 THE COURT: ONE REASON WHY THEY SHOULDN'T WEAR BADGES. ANY OBJECTION TO HAVING MR. HEMMER CONTINUE ON AS JUROR BY THE PROSECUTION?
MR. WHITNEY: NO, YOUR HONOR.
THE COURT: MR. CLARK?
MR. CLARK: MAY I SPEAK, OR MAY I SPEAK TO MY CLIENT, YOUR HONOR?
I DON'T HAVE ANY OBJECTION, YOUR HONOR.
 THE COURT: ALL RIGHT. ARE WE READY FOR THE JUROR TO RETURN TO THE COURTROOM?
MR. WHITNEY: YES, YOUR HONOR.
MR. CLARK: I BELIEVE SO.
 JURY ENTERS THE JURY BOX
THE COURT: ALL RIGHT, BE SEATED, FOLKS.
T. at 56-58.
Appellant submits the mere fact the encounter between Juror Hemmer and the restaurant worker transpired should have been a basis for dismissal of the juror. We disagree. On the record and in the presence of appellant and his counsel, the trial court questioned Juror Hemmer regarding the content and context of the statement and as to whether Juror Hemmer could remain impartial despite hearing such a comment. Thereafter, the trial court provided the State and appellant with the opportunity to question the juror and voice any objections. Appellant neither questioned Juror Hemmer nor objected to his remaining on the jury. Based upon the record, we find the trial court did not deny appellant a fair and impartial jury. Appellant's fourth assignment of error is overruled. V In his final assignment of error, appellant submits the trial court committed prejudicial error in refusing to allow appellant to shave or to obtain an appropriate haircut prior to trial. The record reveals prior to the commencement of trial on the morning of August 23, 1999, Attorney Clark, counsel for appellant, requested a short recess in order to provide time for appellant to shave and cut his hair. The Sheriff's Department had, for three days prior to trial, attempted to get appellant to shave. However, appellant insisted upon having a straight-edged razor, and the Sheriff's Department would only permit him to shave with an electric razor. We find the fact appellant was not provided with the shaving implement of his choice is not tantamount to the trial court's denying him the opportunity to shave. With respect to his haircut, the trial court noted the length of appellant's incarceration (8 months) and determined appellant could have obtained a haircut if he had desired one. Appellant's final assignment of error is overruled.
The convictions and sentences of the Delaware County Court of Common Pleas are affirmed.
GWIN, P.J. and EDWARDS, J. CONCUR.